# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| MICHAEL CARROLL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CV-14 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Michael Carroll appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB"), Childhood Disability

Benefits, and Supplemental Security Income ("SSI").[1]  (*See* Docket # 1.)  For the following

reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Carroll applied for benefits on June 3, 2004, alleging that he became disabled as of

December 23, 2002. (Tr. 63.)  The Commissioner denied his application initially and upon

reconsideration, and Carroll requested an administrative hearing. (Tr. 35-37, 45.)  Administrative

Law Judge ("ALJ") Bryan Bernstein conducted a hearing on September 4, 2007, at which

Carroll, who was represented by counsel; Kathleen Fillenworth, Carroll's mother; and Dr.

Robert Bond, a vocational expert ("VE") testified. (Tr. 551-88.)

On April 18, 2008, the ALJ rendered an unfavorable decision to Carroll, concluding that

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 8-21.)  The Appeals Council denied Carroll's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5.)  Carroll filed a complaint with this Court on January 23, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.)  On appeal, Carroll argues that the ALJ improperly evaluated the opinions of his treating physicians and improperly discredited the credibility of his and his mother's symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Br.") 18-24.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

Carroll was twenty years old at the time of his alleged disability onset date of December 23, 2002. (Br. 2.)  He had completed high school and taken several college courses and had past relevant work experience as a dishwasher, general laborer, and usher. (Br. 2.)  Carroll alleges that he is disabled due to Bipolar Disorder.[3] (Br. 2.)

### B.  Summary of Relevant Medical Evidence

In December, 2002, Carroll sought treatment at the Cornerstone Behavioral Health Center for anger and mood swings after his wife and mother expressed concerns about his behavior. (Tr. 226-31.)  On December 23, 2002, Dr. Robert Milton, a psychiatrist at Cornerstone,

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 600-page administrative record necessary to the decision.

[3] "Bipolar disorder is a disease of the nervous system that involves the brain and the body. . . . 'Bipolar' refers to the two psychological states of mania and depression that are associated with the illness. . . . Although many people with this disorder may have mainly manic or mainly depressive episodes, there is usually a mixture of symptoms at any given time. . . .  (Opening Br. 2 (*citing* WES BURGESS, THE BIPOLAR HANDBOOK 1-2 (2000)).)

diagnosed Carroll with Bipolar II disorder, depressed and depressive disorder NOS (non-specific), while ruling out Intermittent Explosive Disorder. (Tr. 225.) Dr. Milton assigned Carroll a Global Assessment of Functioning ("GAF") Score of 50. (Tr. 225.)[4] On January 18, 2003, Carroll saw Dr. Marco Baquero, another psychiatrist at Cornerstone, and was prescribed Depakote. (Tr. 214.) Carroll was admitted to Ball Memorial Hospital on January 21, 2003 after his symptoms escalated. (Tr. 163, 146-73.) Carroll reported episodes of extreme paranoia and told doctors his anger was out of control. (Tr. 163.) He was treated for hyperthyroidism and was discharged on January 24, 2003, after reporting he was feeling much better. (Tr. 147-48.)

During a February 4, 2003, follow-up, Carroll reported to Dr. Baquero that he continued to feel angry and Dr. Baquero increased the dosages of his Zyprexa and Depakote prescriptions. (Tr. 214.) A week later, Dr. Baquero reported that Carroll had shown definite improvement on the increased dosages and was feeling much better. (Tr. 202.) On March 11, 2003, however, Dr. Baquero completed an evaluation in which he opined that Carroll would be unable to handle life in college or get a job due to his inability to relate well to people. (Tr. 209.) Dr. Baquero felt that with treatment Carroll would be able to hold a part-time job and get along better with his family and co-workers. (Tr. 210.)

Carroll last saw Dr. Baquero on April 6, 2003, and reported that he was doing very well on his medication. (Tr. 202.) Dr. Baquero instructed Carroll to continue taking both the Depakote and Zyprexa. (Tr. 202.) Two days later, Carroll and his wife met with Donald Anthony, a Licensed Clinical Social Worker and agreed that his temper was much less of an

---

[4]A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* Diagnostic & Statistical Manual of Mental Disorders - Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 50 is indicative of an individual who has serious symptoms or any serious impairments in social, occupational, or school functioning.

issue and that there had been no recent violence. (Tr. 201.)  Carroll indicated that his mood fluctuated much less while he was taking his medication. (Tr. 201.)  Anthony assigned Carroll a GAF score of 63, which is indicative of an individual who has some mild symptoms or some difficulty in social, occupational, or school functioning, but is generally functioning fairly well and has some meaningful interpersonal relationships. (Tr. 201.)

Carroll did not receive further psychiatric treatment until April 12, 2004, when he saw Dr. James Driver at Grant-Blackford Mental Health, complaining of a reoccurrence of mood swings. (Tr. 196-97.)  Carroll reported that he had been off his medication for a year and that he was under considerable stress from on an ongoing divorce, financial difficulties, having to drop out of college, being unable to find employment, and facing deployment of his National Guard unit. (Tr. 196.)  Based on Carroll's prior history, Dr. Driver diagnosed him with bipolar disorder, rapid cycling type, and assigned a GAF score of 50. (Tr. 196.)  Dr. Driver prescribed Depakote and Risperdal and penned a letter stating that Carroll's bipolar disorder rendered him unfit for military service. (Tr. 195, 197.)

On May 20, 2004, Carroll was examined by Dr. Avelina Vitug, a staff psychiatrist with the Veterans Administration. (Tr. 327-28.)  He reported mood swings, depression, and sleep disturbances and indicated he had been previously diagnosed with bipolar disorder. (Tr. 328.) Dr. Vitug found Carroll to be calm, coherent, relevant, and in a fair mood, with no acute psychotic or hypomanic symptoms. (Tr. 328.)  Carroll was diagnosed with bipolar disorder, mixed, and prescribed Depakote and Risperidone. (Tr. 328.)

One week later, Carroll had a counseling session with Roxanne Chew, a VA social worker. (Tr. 361-63.)  Carroll indicated that his medication was working, his bipolar symptoms

were more stable, and he was not as depressed, but was just not motivated. (Tr. 362.) Ms. Chew reported similar findings after meeting with Carroll three more times in June, 2004. (Tr. 353-55, 358, 360.) Her notes indicated that much of Carroll's low self-esteem could be attributed to his weight gain, lack of social outlets, and poor motivation in achieving life goals due to laziness. (Tr. 355.)

Carroll was evaluated at the VA on July 23, 2004, by Dr. Theodore Miller. (Tr. 317-26.) Dr. Miller found it difficult to evaluate Carroll's psychiatric condition because many of the events causing him stress had been eliminated. (Tr. 320.) Dr. Miller indicated that it would be difficult to predict Carroll's future health because of his past diagnosis of hyperthyroidism and because he had only restarted his medication regime in April, 2004. (Tr. 320.) He ultimately diagnosed Carroll with bipolar disorder, type I, with the most recent episode being depressed, moderate, and assigned a GAF score of 48. (Tr. 324.)

On August 12, 2004, Carroll again met with Dr. Vitug, who noted that he was cooperative and pleasant and was experiencing no side effects from his medication. (Tr. 327.) She found that Carroll was coherent and relevant; his mood was fair; he had no psychotic symptoms and was in good contact with reality; and that he had no hallucinations, delusions, or suicidal thoughts, but that he did have faulty judgment and insight into his own problems. (Tr. 327.) That same day, Carroll met with Ms. Chew, who noted that he was suffering from minimal depression and bipolar symptoms. (Tr. 351.) Carroll saw Ms. Chew again two weeks later and reported that he had enrolled part-time in Ivy Tech and was taking three classes a week. (Tr. 337.) Carroll felt that his medications were working for him and denied having depression or bipolar symptoms. (Tr. 337-38.)

On September 7, 2004, Carroll was examined by Dr. Robert Fischer, a state agency consulting psychologist. (Tr. 308-10.) Carroll told Dr. Fischer that he sometimes felt irritable and anxious while on the medication, but that overall his mood swings were moderated and his depression was largely relieved. (Tr. 308.) Dr. Fischer performed a mental status examination and found Carroll to be well oriented, personable, and functioning reasonably well. (Tr. 310.) He diagnosed Carroll with bipolar I disorder, most recent episode depressed; generalized anxiety disorder; panic disorder without agoraphobia; and cyclothymia. (Tr. 310.) Dr. Fischer assigned Carroll a GAF score of 80, indicating that his symptoms, if present, are transient and expectable reactions to psychosocial stressors and that he only has a slight impairment in social, occupational, and school functioning. (Tr. 310.)

Carroll met with Dr. Vitug on November 3, 2004, complaining of restlessness, negative thoughts, and irritability. (Tr. 519.) Dr. Vitug noted that Carroll was coherent and relevant, his mood was fair, he had no psychotic symptoms or suicidal thoughts, and was in good contact with reality, although he had impaired judgment and insight. (Tr. 519.) Carroll quit his job as a dish washer at a Cracker Barrel restaurant that same month. (Tr. 71.)

On January 26, 2005, Dr. Vitug reported that Carroll was doing fine on his medication and had no problems or complaints. (Tr. 518.) She found Carroll to be calm, in good contact with reality, and with fair judgment and insight. (Tr. 518.) That same day, Carroll's mother told Ms. Chew that he wished to resume counseling. (Tr. 517.) Ms. Chew expressed her concern that Carroll had been canceling or skipping previous appointments and indicated that she felt Carroll was often simply telling her what she wanted to hear. (Tr. 517.) Nevertheless, she agreed to refer him to another VA social worker, Deloise Bryant. (Tr. 517.)

Carroll met with Ms. Bryant on February 28, 2005, for a counseling session. (Tr. 513.) He reported feeling down in recent weeks, but that he had been working on his self esteem. (Tr. 513.) He was referred by Ms. Bryant to Compensated Work Therapy to determine whether he could be motivated to become gainfully employed. (Tr. 513.) In March, 2005, Carroll reported to Ms. Bryant that he had secured a part-time job in addition to attending school, although he still slept for the greater part of the day if he did not have something to do. (Tr. 511.) Carroll had no further sessions with Ms. Bryant after March, 2005. (Tr. 509.)

Carroll did, however, continue to regularly see Dr. Vitug. On April 20, 2005, Dr. Vitug reported that Carroll was doing well in school, had no complaints, and was not experiencing any side effects from his medication. (Tr. 510-11.) She found that he was coherent and relevant, in a fair mood, with no psychotic symptoms, hallucinations, or delusions, and that he had fair judgment and insight. (Tr. 511.) On July 20, 2005, Carroll reported that he had enrolled in classes at Ball State University and that he was coping well and had no problems with his medication. (Tr. 508.) Dr. Vitug found him to be in a similarly fair mental state. (Tr. 508.)

On October 25, 2005, Carroll reported that he had to quit school because he was not attending classes and had lost his job. (Tr. 506-07.) He had, however, secured another part-time job. (Tr. 506-07.) Dr. Vitug screened him for depression and obtained a negative result. (Tr. 507.) That same day, however, Carroll was screened by a VA nurse practitioner and obtained a positive result. (Tr. 504-06.)

Dr. Vitug met with Carroll again on January 18, 2006, and he reported that he was coping well and had no complaints. (Tr. 504.) He also indicated that he was enrolled in school and working. (Tr. 504.) Carroll met with Dr. Vitug three more times during 2006, each time

indicating to her that he was taking classes and working part-time. (Tr. 499, 501, 502.)

On January 4, 2007, Carroll again met with Dr. Vitug, who noted in her report that he was doing well with no complaints, although he had dropped three of his four classes. (Tr. 498.) On January 31, 2007, Carroll began meeting with Willie Woods, a new counselor at the VA. (Tr. 497-98.) During their February 6, 2007, meeting, Mr. Woods found Carroll to be very calm and collected, although Carroll did complain that he did not have firm control of his temper. (Tr. 497.) Mr. Woods indicated that Carroll was in the manic stage of his bipolar disorder after he stated he planned to buy an expensive truck he could not afford. (Tr. 497.) After discussing the subject, Carroll eventually agreed with Mr. Woods that purchasing the truck would be a poor decision. (Tr. 497.) Mr. Woods also found that Carroll was not suicidal or homicidal, although he did tend to blame his problems on his diagnosis of bipolar disorder. (Tr. 496-97.) Later that month, Carroll reported that he had been volunteering at the VA pharmacy and that it was helping him with his daily activities. (Tr. 496.) Carroll received a negative result on a depression screening on February 27, 2007. (Tr. 494-95.)

In a March 29, 2007, report, Dr. Vitug wrote that Carroll was doing fine, was cooperative and pleasant, and was coping with no complaints. (Tr. 489.) She found Carroll to be calm, in a fair mood, and in good contact with reality, with no hallucinations or delusions. (Tr. 489.) On April 3, 2007, Mr. Woods noted that Carroll was not suicidal or homicidal. (Tr. 488.) Carroll met with Mr. Woods again on June 20, 2007, and told him that he had recently experienced the manic phase of his bipolar disorder. (Tr. 479.) In his report, Mr. Woods noted that he had been volunteering at the VA pharmacy and found him to be stable and not suicidal. (Tr. 479.) Carroll indicated that he had applied for a job with the VA in Fort Wayne, Indiana. (Tr. 479.)

On August 30, 2007, a few days before Carroll's administrative hearing, Dr. Vitug wrote a four-sentence long letter, addressed "To Whom It May Concern," in which she stated that Carroll had been diagnosed with Bipolar Disorder, Mixed, and that he was currently taking Depakote and Citalopram. (Tr. 550.)  She wrote that: "Due to his mental condition and medication he is unable to sustain gainful employment." (Tr. 550.)

### C.  Carroll's Hearing Testimony

On September 4, 2007, Carroll appeared with counsel and testified before Administrative Law Judge Bryan Bernstein. (Tr. 551-73.)  Carroll began his testimony by describing his previous work and educational history. (Tr. 555.)  He indicated that he last worked in October, 2006 as a part-time student office assistant at Ball State University. (Tr. 555.)  He testified that the last full-time job he held was at a Worthington Industries steel mill in 2003. (Tr. 556.)  He also stated that he worked part-time at a Cracker Barrel restaurant and Steve and Barry's Sportswear in 2004. (Tr. 557-59.)  He maintained that he was unable to sustain employment due to the manic phases of his bipolar disorder. (Tr. 558.)

Carroll testified that he experienced manic phases of his bipolar disorder that he could not control while trying to live independently, work, or go to school. (Tr. 570.)  He testified that he would cycle through manic and depressive stages rather quickly, often on a daily basis, and that approximately every six weeks he would become overwhelmingly manic or depressive for about one week. (Tr. 568.)  Carroll testified that when he is experiencing a manic phase he finds it hard to sleep, and is agitated and hyperactive. (Tr. 566.)  He stated that he often spends money irrationally, such as purchasing two trucks in the same day. (Tr. 566.)  Carroll believed that he would be unable to hold any type of job when he is intensely manic or depressive. (Tr. 568.)

Carroll's mother, Kathleen Fillenworth, also answered questions given by Carroll's attorney. (Tr. 573-82.) She testified that she believed her son suffered from recurring manic episodes occurring approximately every four to six weeks. (Tr. 574.) She stated that he is frequently restless, cannot sleep, and often goes out for hours at a time. (Tr. 577.) Fillenworth further testified that when he is depressive, Carroll will often not bathe and just sleep at strange hours. (Tr. 579.) She testified that although she and her family were making progress towards having Carroll live independently, she did not believe that he was currently capable of taking care of himself. (Tr. 581-82.)

Finally, Robert Bond, the vocational expert, testified about what types of work Carroll may be able to carry out. (Tr. 582-88.) The ALJ asked the VE to consider an individual who is unable to do work that requires a close regimentation of production. (Tr. 582.) The VE testified that Carroll would be able to perform his past work as a packager, but would be unable to perform any of his other prior work. (Tr. 583.) The VE testified that Carroll could find work at both the light and medium exertional levels. At the light exertional level, Carroll could work as a sorter (200 jobs in the regional area), a routing clerk (250 jobs), and a checker (125 jobs). (Tr. 583.) At the medium level, the VE testified that Carroll could resume his previous work as a packager (400 jobs), or work as a laundry worker (200 jobs), or a general laborer (300 jobs). (Tr. 583-84.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Additionally, a claimant is entitled to Disabled Adult Child benefits if they are the child

of a person who is receiving disability benefits themselves or is deceased. 42 U.S.C § 402(d); 20 C.F.R. § 404.350. The claimant must be dependent on the insured parent, unmarried, and either under age eighteen or have a disability that began before the age of twenty-two. 20 C.F.R. § 404.350. The definition of disabled for purposes of Disabled Adult Child benefits is the same as that for DIB and SSI. *See* 42 U.S.C. §§ 1382c(a)(3)(A), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On April 18, 2008, the ALJ rendered his opinion. (Tr. 11-21.) He found at step one of the five-step analysis that Carroll had not engaged in substantial gainful activity since his alleged

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

onset date of December 23, 2002. (Tr. 14.) At step two, he determined that Carroll's bipolar disorder qualified as a severe impairment. (Tr. 14.) At step three, he determined that Carroll's impairment was not severe enough to meet a listing. (Tr. 14.) Before proceeding to step four, the ALJ found that Carroll's disability allegations and testimony were not reliable. (Tr. 14-16.) Additionally, the ALJ determined that Carroll had the following RFC:

> [T]he claimant is not able to perform work that imposes a close regimentation of production. Close regimentation of work activity is a consequence of certain operational demands for functioning within close tolerances or for an unusually rapid level of productivity. This might be required when there is a high value placed on the product quality, the raw materials, the equipment employed, or upon coordination with others and the pace of production. Close and critical supervision in this context would produce unacceptable distress. This work is different from jobs that allow the employee some independence in the determination of timing different work activities or the pace of work. Such flexibility as that in the work structure permits the employee an opportunity to catch up with ordinary productivity, especially when there has been a respite.

(Tr. 16.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Carroll could not perform his past relevant work. (Tr. 19.) At step five, he concluded that there are a significant number of jobs with a light exertional level in the national economy that Carroll could perform, such as a sorter (200 jobs exist in the relevant region), a routing clerk (250 jobs), and a checker (125 jobs). (Tr. 20.) The ALJ also determined that Carroll could perform several jobs at the medium exertional level, such as a hand packager. (Tr. 20.) He therefore concluded that Carroll was not under a disability at any time from the alleged onset date through the date of the decision and his claim for benefits was denied. (Tr. 20.)

*C. The ALJ Properly Evaluated the Testimony of Carroll's Treating Physicians.*

Carroll first argues that the ALJ improperly evaluated the opinions of his treating

physicians, Dr. Avelina Vitug and Dr. Marco Baquero. (Br. 18.)  He claims that since both doctors found that he was unable to sustain gainful employment, the ALJ erred in discrediting these opinions because they were conclusory and inconsistent with Carroll's treatment notes. (Br. 18.)  Carroll's argument ultimately falls short of warranting a remand.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

An ALJ may discount a treating physician's opinion if it is not well-supported or is inconsistent with other substantial evidence, as long as he minimally articulates his reasons for doing so. *Skarbek v. Barnhart,* 390 F.3d 500, 503-04 (7th Cir. 2004).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).  The

Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to benefits simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

In this instance, the ALJ explained that although there are two opinions from Dr. Baquero and Dr. Vitug claiming that Carroll's bipolar disorder imposes significant work restrictions, Carroll's medical history also includes "hundreds of pages of treatment notes that do not support either statement that the claimant cannot work." (Tr. 17.)  The ALJ found it reasonable not to assign great weight to Dr. Baquero's opinion because he had not treated Carroll since 2004 and his opinion was not supported by the subsequent medical history. (Tr. 18.)  Additionally, he discredited Dr. Vitug's claim that Carroll was unable to work because her opinion was inconsistent with her own progress notes in which she frequently observed that Carroll was doing fine and had no complaints. (Tr. 18-19.)  Because of Carroll's diagnosis of bipolar disorder, the ALJ specifically considered the multi-step analysis found in the Regulations for Listing 12.04 (Affective Disorders). (Tr. 18-19.)  The ALJ ultimately concluded that Carroll's condition did warrant medical attention, but that he was not chronically disabled. (Tr. 19.)

This thorough treatment of Carroll's case, however, did not deter him from finding fault

with the ALJ's determination. Carroll first takes issue with the ALJ's reasoning concerning Dr. Vitug's opinion, arguing that the ALJ improperly found Dr. Vitug's opinion to be conclusory. (Br. 19.) Carroll cites *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008) for the proposition that the ALJ is required to give controlling weight to the opinion of a treating physician: the aptly named "treating physician rule." *See* 20 C.F.R. § 404.1527(d)(2). The treating physician rule "directs the [ALJ] to give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Bauer*, 532 F.3d at 608 *(quoting Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006)).

In deciding that Dr. Vitug's opinion did not merit persuasive weight, the ALJ assessed the opinion under several of the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d). *See generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the ALJ must consider the factors articulated in 20 C.F.R. §§ 404.1527 and 416.927). The ALJ twice noted that Dr. Vitug was Carroll's treating physician. (Tr. 17); *see* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5). He further considered the length and frequency of the treatment relationship in outlining Carroll's doctor visits from 2003 to the time of his decision. (Tr. 17-18); *see* 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(I).

Despite Dr. Vitug's position as Carroll's treating physician, the ALJ found that another factor, consistency with the evidence as a whole, undermined his opinion. (Tr. 17-19); *see Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) ("[T]he ALJ showed that he was aware of the roles these doctors played in Berger's treatment, but he nonetheless decided to discount their medical opinions for [other reasons]. This was not error.") (citing *Hofslien v. Barnhart*, 439

F.3d 375, 377 (7th Cir. 2006)); *see also* 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). In so finding, the ALJ gave examples from the testimony and enumerated notes from the examining physicians' records illustrating his point.

For instance, the ALJ set forth details from the testimony that seem to contradict the allegations of total disability, such as Carroll's working at several part-time jobs, volunteering at the VA pharmacy, and taking college classes. (Tr. 18-19.) He noted Carroll's testimony that his last job ended not because of his disability, but because he was no longer eligible after withdrawing from college. (Tr. 18.) He also delved into Dr. Vitug's treatment records, finding that her "own observations and medical reports do not support her conclusory statement that the claimant is disabled." (Tr. 18.) The ALJ discussed Dr. Vitug's frequent observations that Carroll had no complaints, was doing fine, and was doing well in school. (Tr. 18.) The ALJ further noted that Dr. Vitug's progress notes did not support Carroll's claim that acute periods occur every four to six weeks. (Tr. 19.) The ALJ, therefore, thoroughly addressed the regulatory factor of consistency with the record as a whole, highlighting aspects of the witness testimony and Dr. Vitug's own less severe findings which could be construed as inconsistent with Dr. Vitug's later opinion that Carroll could not work. The ALJ's reasoning is thus easily traced, in light of the various notes which are arguably inconsistent with Dr. Vitug's assessment, given a few days prior to his hearing, of extreme limitations. *See Skarbek v. Barnhart,* 390 F.3d 500, 503-04 (7th Cir. 2004) (stating that an ALJ may discount a treating physician's opinion if it is not well-supported by medical findings or is inconsistent with substantial evidence of record, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability).

"If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ 'minimally articulate[d]' his reasons—a very deferential standard that we have, in fact, deemed 'lax.'" *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing *Berger*, 516 F.3d at 545 (internal quotation marks and citation omitted)). Because the ALJ addressed the regulatory factors and adequately articulated reasons for not assigning great weight to Dr. Vitug's opinion, the ALJ clearly evaluated Dr. Vitug's opinion in accordance with 20 C.F.R. §§ 404.1527 and 416.927.

As such, the present case is distinguishable from *Bauer*. In *Bauer*, the court found that the ALJ erred in discounting the physicians' opinions on the basis that the claimant was able to attend to basic self-care and household chores, without considering other evidence that she was heavily medicated and required substantial assistance. *Id*. at 608-09. The claimant in Bauer was "hospitalized several times with hallucinations, racing thoughts, thoughts of suicide, and other symptoms of bipolar disorder." *Id*. at 607. Despite what Carroll may wish, *Bauer* does not stand for the proposition that an ALJ must summarily accept as true any statement simply because it is made by a treating physician. Rather, the ALJ must give controlling weight to the opinion if it is "not inconsistent with the other substantial evidence." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Hofslien*, 439 F.3d at 376. Here, the ALJ discounted the treating physician's opinion after following the requirements set forth in the relevant Social Security regulations and Seventh Circuit case law. He adequately articulated reasons for discounting the opinion, he set forth examples of inconsistencies from Dr. Vitug's own treatment records and the consultative physicians' evaluations, and he evaluated various regulatory factors throughout. *See Hofslien*, 439 F.3d at 377 (explaining the steps involved in the treating source rule and commenting that

"the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances"); *see also Berger*, 516 F.3d at 545 ("An ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." (internal quotation marks and citation omitted)). Accordingly, Carroll's arguments based on *Bauer* fail to demonstrate a basis for remand.

Moreover, although Carroll implies that the ALJ accorded no weight to Dr. Vitug's opinion (*see* Br. 18-20), the ALJ actually acknowledged that Carroll does suffer from some measure of impairments, and even credited Dr. Vitug's opinion somewhat by incorporating it into his RFC. "There is medical evidence of a functional disturbance preventing the claimant from working in stressful environments that impose close supervision and scrutiny, and the residual functional capacity accommodates this limitation." (Tr. 19.) Thus, the ALJ did give some weight to Dr. Vitug's opinion, but did not simply accept her summary finding that: "Due to [Carroll's] medical condition and medication he is unable to sustain gainful employment." (Tr. 550.) *See, e.g.,Thao v. Astrue*, No. 08-C-0033, 2008 WL 2937425, at *4 (E.D. Wis. July 24, 2008) ("[T]he ALJ did not entirely reject the reports. He found that plaintiff suffered from the severe impairments listed in the reports; he simply disagreed with the extent of limitation assessed by plaintiff's doctors."). To the extent that the record contains conflicting evidence concerning the severity of Carroll's mental limitations, it is the ALJ's role to weigh the conflicting medical evidence and resolve the conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Here the ALJ did just that, toiling through numerous medical opinions of record to resolve the conflicts. Absent legal error

or a "patently wrong" decision, the Court will not remand the case simply in hopes that a new ALJ will view the same evidence in a different light. *See Young v. Barnhart*, 362 F.3d 995,1001 (7th Cir. 2004); *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Carroll next maintains that even though Dr. Baquero had only treated him for about three months, his opinion is "essentially the same as those of the psychiatrist and psychologist in *Bauer*." (Br. 19.)  The ALJ, however, found Dr. Baquero's opinion to be conclusory and not supported by the medical evidence. (Tr. 17.)  As he did with Dr. Vitug's opinion, the ALJ properly evaluated Dr. Baquero's opinion under 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ noted that Dr. Baquero was Carroll's treating physician. (Tr. 17); *see* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5).

However, despite Dr. Baquero's position as Carroll's treating physician, the ALJ found that two factors, consistency with the evidence as a whole and the length of the treatment relationship, undermined his opinion. (Tr. 17-18); *see Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) ("[T]he ALJ showed that he was aware of the roles these doctors played in Berger's treatment, but he nonetheless decided to discount their medical opinions for [other reasons]. This was not error.") (citing *Hofslien*, 439 F.3d at 377 ); *see also* 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  The ALJ found that, as was the case with Dr. Vitug's opinion, Dr. Baquero's opinion was not supported by the medical evidence. (Tr. 17-18.) He also gave great weight to the fact that Dr. Baquero only briefly treated Carroll in 2003. (Tr. 17-18.)  Given the lax standard of review and that the ALJ has "minimally articulated" his

reasoning, *Berger*, 516 F.3d at 545, it cannot be said that the ALJ committed reversible legal error in discrediting Dr. Baquero's opinion. *See Young*, 362 F.3d at 1001; 20 C.F.R. §§ 404.1527 and 416.927.

Lastly, Carroll contends that when the ALJ found the doctor opinions inconsistent with the treatment records, he "relied too much on his own medical expertise, overlooked important facts of record, and case law." (Br. 19.) Carroll argues that "[a]lthough a proper ALJ opinion need not be based on medical opinion, the ALJ in the instant case has rejected all medical opinions of record on her [sic] work capabilities and relied entirely on his own interpretation of the evidence in reaching her [sic] mental residual functional capacity." (Br. 19-20.)

This contention, however, misstates the substance of the ALJ's opinion. The ALJ did not, as Carroll claims, reject all medical opinions and rely entirely on his own interpretations. The ALJ repeatedly acknowledged that Carroll did suffer from some type of behavioral condition. "There is medical evidence of a functional disturbance preventing the claimant from working in stressful environments that impose close supervision and scrutiny . . ." (Tr. 19.) Contrary to Carroll's claim, the ALJ did not pass judgment on whether he was actually suffering from bipolar disorder, but rather decided that his condition did not meet the requirements of a disability listing. "The records do not show a chronically mentally disabled individual, but his conduct does warrant medical attention." (Tr. 19.) Though Carroll may disagree with the ALJ's ultimate weighing of the evidence, such disagreement does not provide a basis for overturning the ALJ's decision. *See Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot reweigh the evidence or substitute our own judgment for that of the ALJ. If reasonable minds can differ as to whether [the claimant] is disabled, we must uphold the decision under review."

(citations omitted)).

Carroll also claims that the ALJ overlooked several important facts, such as the episodic nature of bipolar disorder and the inability of those suffering from bipolar disorder to truly recognize their own limitations. (Br. 19-20.)  As before, Carroll misstates the ALJ's opinion. The ALJ recognized the episodic nature of Carroll's limitations in crafting his RFC assessment. (Tr. 18-19.)  He found that Carroll was limited during acute periods of depression, but that Dr. Vitug's own progress reports did not support Carroll's claim that the depression reoccurred every four to six weeks. (Tr. 19.)  Accordingly, the ALJ crafted an RFC that reflected Carroll's inability to "perform work that imposes a close regimentation of production" and identified several potential jobs that would fit with this limitation. (Tr. 16, 20.)  Furthermore, the ALJ did not only rely on Carroll's testimony, but also looked at reports from his treating physicians, his lengthy medical record, and testimony from his mother.  The ALJ's opinion therefore cannot be said to only be based on Carroll's possibly skewed perceptions of his own symptoms.  As before, Carroll simply seems to take issue with the ALJ's weighing of the evidence.  In the absence of clear legal error or a "patently wrong" decision, the Court will not remand the case simply in hopes that a new ALJ will view the same evidence in a different light. *See Young*, 362 F.3d at 1001; *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

### D. The ALJ's Credibility Determination Will Not Be Disturbed.

Carroll also asserts that the ALJ erred when evaluating the credibility of his symptom testimony. (Br. 21.)  Specifically, he argues that the ALJ erred in discrediting his testimony because it was inconsistent with the detailed progress notes of his treatment. (Br. 21.)  Carroll also argues that the ALJ improperly discredited the testimony of his mother, Kathleen

Fillenworth. (Br. 23.)

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers*, 207 F.3d at 435.  If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . .").

The ALJ specifically took note of Carroll's credibility throughout his decision and devoted almost two full pages to the question. (Tr. 14-20.)  He recounted Carroll's testimony in depth, noting his complaints of being unable to control his temper and being violent with his family. (Tr. 15.)  "[Carroll] described that when he is in a manic cycle, he has trouble sleeping, has thoughts that are not rational, spends money irrationally, feels aggressive, becomes hyperactive, and becomes severely agitated." (Tr. 15.)  Carroll's mother, Kathleen Fillenworth, also testified that he has difficulty with motivation and has trouble concentrating. (Tr. 15.)  She also indicated that when her son is in a manic phase, he lacks control and makes poor decisions, such as buying cars he could not afford.[6] (Tr. 15.)

Despite this testimony, the ALJ did not assign much weight to the testimony of either

---

[6] In April, 2007, Carroll apparently purchased two automobiles in one day.  One, however, was a "junker" he purchased for $450 and the other was promptly returned to the dealership. (Tr. 16.)

Carroll or Ms. Fillenworth. He concluded that:

> The testimony from the claimant and his mother is not necessarily an unreliable account of actual events; however, the characterization of his clinical behavior may be biased by the interest in obtaining benefits. The claimant's mother's perspective appeared to be colored by disappointment in his conduct. However, she also voiced hope that the claimant was moving forward to more independence. Her report about the claimant's conduct in purchasing two vehicles in one day could be explained by possible rationales that were not explored, such as he planned to return one of the vehicles. Further, he may have felt that he could afford a car based on his employment and veteran's benefits. In any event, although Ms. Fillenworth's testimony warrants attention and has been considered, as a lay person, her opinion that the claimant cannot work is not found to be persuasive. In addition, although the claimant's testimony has been considered, his allegations of medication side-effects and inability to work are not supported by the treatment notes . . .

(Tr. 16.)

Yet, this analysis does not deter Carroll from challenging the ALJ's reasoning. Carroll first contends that the ALJ erred in discrediting his testimony because it was inconsistent with the treatment notes. (Br. 21.) He sees error in the ALJ's finding that the progress notes showed that Carroll had the "capacity and energy to persist in his education and work due to the stability provided by the medication . . ." (Br. 21.) Carroll claims that the "picture painted by the progress notes is consistent with the opinions of his treating psychiatrist and his testimony as it shows an individual who struggles very hard with a very serious permanent mental impairment but is only able to at best work part-time." (Br. 22.) He also argues that the ALJ did not understand the nature of bipolar disorder, when he failed to see how his poor motivation, procrastination, and laziness were actually being caused by his impairment. (Br. 22-23.) Finally, he argues that the ALJ improperly discredited Ms. Fillenworth's testimony as biased. (Br. 23.)

Carroll's arguments again fall short of warranting a remand. Contrary to Carroll's implication, the ALJ did not just summarily dismiss his testimony. The ALJ clearly considered

Carroll's hearing testimony that he was unable to work in making his determination. (*See* Tr. 16 "In addition, although the claimant's testimony has been considered, his allegations . . . are not supported by the treatment notes . . . ). However, the ALJ was also confronted with an apparently persuasive body of medical evidence showing that Carroll was in fact not disabled. For example, the ALJ found that Carroll's medical record and treatment history discredited his claim of complete disability, just as they did his doctors'. (Tr. 17-19.) The ALJ also considered Carroll's ability to hold part-time jobs, which directly challenges his assertion that he is completely unable to work. (Tr. 19.) *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that [the claimant] was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled.") The ALJ found that Carroll saw improvements in his condition when he regularly took his medication. (Tr. 19.) Furthermore, the ALJ considered that many other people, when faced with spousal abandonment and difficulties in schooling would respond similarly. (Tr. 19.) Although Carroll claims that the ALJ overlooked the episodic nature of bipolar disorder, the ALJ did incorporate this factor into his final decision and RFC. The ALJ stated on multiple occasions that there was medical evidence of a functional disturbance. (Tr. 16, 18, 19.) However, after considering all the evidence, he did not find Carroll to be legally disabled.

Since the ALJ's decision is grounded in the record and he articulated his analysis of the evidence "at least at a minimum level," *Ray*, 843 F.2d at 1002, his decision will not be disturbed. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (stating that an ALJ is entitled to make reasonable inferences from the evidence of record). The ALJ drew "an accurate and logical bridge," *Shramek*, 226 F.3d at 811, between the substantial evidence in Carroll's medical

history that his condition was not as debilitating as he claimed, his ability to at least work part-time, his educational pursuits, and his other personal and social setbacks in ultimately concluding that Carroll's testimony of a complete inability to work was not entirely credible. (*See* Tr. 14-19.) This reasoning cannot be said to be "patently wrong," *Powers*, 207 F.3d at 435, and the Court will not re-weigh the evidence in the hope that it will come out in Carroll's favor this time. *See Flener*, 361 F.3d at 447; SSR 96-7p.  Furthermore, although Carroll may disagree with the ultimate weighing of the evidence, such disagreement is not a basis for remand. *See Young*, 362 F.3d at 1001; *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

Similarly, the ALJ did not commit error in not assigning much weight to the testimony of Carroll's mother, Ms. Kathleen Fillenworth.  She testified that Carroll has poor motivation and trouble concentrating. (Tr. 15.)  She also offered as evidence of his disability the fact that in April, 2007, he purchased two cars during one day.  The ALJ, however, found her testimony to be clouded by her disappointment with her son and found that there was evidence that he may have felt he could afford a new car and that he intended to return one of the cars. (Tr. 16).  "In any event, although Ms. Fillenworth's testimony warrants attention and has been considered, as a lay person, her opinion that the claimant cannot work is not found to be persuasive." (Tr. 16.)

Carroll now claims that there was "ample evidence in the record that [he] did not intend to return one of the vehicles (Tr. 196, 323, 497)." (Tr. 23.)  He also claims that since the ALJ did not specifically cite any evidence of bias by Ms. Fillenworth, there was not substantial evidence for not assigning great weight to her testimony. (Tr. 24.)

As before, Carroll's argument ultimately seems to be that he disagrees with the weight the ALJ assigned to Fillenworth's testimony.  Despite Carroll's argument, the evidentiary record

confronting the ALJ was far from clear that Carroll definitely bought the two cars knowing he could not keep either. Rather, the ALJ weighed the conflicting evidence and ultimately assigned little weight to this testimony. Furthermore, the ALJ did not completely disregard Ms. Fillenworth's testimony because of the possibility of bias. Indeed, he stated that her testimony "warrants attention" and "has been considered". (Tr. 16). Rather, he noted that although her testimony is "not necessarily an unreliable account of actual events . . .", her lay opinion that Carroll was unable to work was not persuasive. (Tr. 16.) Given that the ALJ is in the best position to evaluate the credibility of a witness, the Court gives special deference to his determination. *Powers,* 207 F.3d at 435. The ALJ's decision cannot be said to be "patently wrong" and the Court will not remand the case simply in hopes that a new ALJ will view the same evidence in a different light. *See Young*, 362 F.3d at 1001; *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

   In sum, the Court will not accept Carroll's plea to re-weigh the evidence in the hope that it will come out in his favor a second time. *See Flener*, 361 F.3d at 447. The ALJ has built an accurate and logical bridge between the evidence and his conclusion, *see Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong," *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *id.*, will not be disturbed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

Clerk is directed to enter judgment in favor of the Commissioner and against Carroll.

SO ORDERED.

Enter for November 19, 2009.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
